UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LILIANA MARIA DIAS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 15-cv-13003-ADB |
| CAROLYN COLVIN, | * | |
| *Commissioner of Social Security*, | * | |
| | * | |
| Defendant. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff Liliana Maria Dias ("Ms. Dias" or "Claimant") brings this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of

the Commissioner of the Social Security Administration (the "Commissioner") denying her

claim for Social Security Disability Insurance ("SSDI"). Currently pending are Claimant's

motion to reverse the Commissioner's decision denying her disability benefits [ECF No. 25], and

the Commissioner's cross-motion for an order affirming the decision. [ECF No. 32]. For the

reasons described herein, the Court finds that the ALJ's decision is supported by substantial

evidence and therefore <u>DENIES</u> Claimant's motion to reverse and remand and <u>ALLOWS</u> the

Commissioner's motion to affirm.

## I.    BACKGROUND

### A.    Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability Claims

"The Social Security Administration is the federal agency charged with administering

both the Social Security disability benefits program, which provides disability insurance for

covered workers, and the Supplemental Security Income program, which provides assistance for

the indigent aged and disabled." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42

U.S.C. §§ 423, 1381a).

The Social Security Act (the "Act") provides that an individual shall be considered to be

"disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can
> be expected to result in death or that has lasted or can be expected
> to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); see also 42 U.S.C. § 423(d)(1)(A). The disability must be severe,

such that the claimant is unable to do his or her previous work or any other substantial gainful

activity that exists in the national economy. See 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R.

§ 416.905. The claimant must also establish that he or she was disabled under the Act during the

relevant time period between the alleged onset date and the date when the claimant last met the

earning requirements for disability benefits under the Act. Rodriguez-Gonzalez v. Astrue, 854 F.

Supp. 2d. 176, 179 (D.P.R. 2012) (citing Evangelista v. Sec'y Health & Human Servs., 826 F.3d

136, 140 n.3 (1st Cir. 1987)).

When evaluating a disability claim under the Act, the Commissioner uses a five-step

process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination
> may be concluded at any step along the process. The steps are: 1) if
> the applicant is engaged in substantial gainful work activity, the
> application is denied; 2) if the applicant does not have, or has not
> had within the relevant time period, a severe impairment or
> combination of impairments, the application is denied; 3) if the
> impairment meets the conditions for one of the "listed" impairments
> in the Social Security regulations, then the application is granted; 4)
> if the applicant's "residual functional capacity" is such that he or she
> can still perform past relevant work, then the application is denied;
> 5) if the applicant, given his or her residual functional capacity,
> education, work experience, and age, is unable to do any other work,
> the application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

B.      Procedural Background

Ms. Dias filed her application for SSDI benefits on April 18, 2008. [R. 90].[1] She alleged

that she became disabled on January 2, 2004, due to fibromyalgia, depression, anxiety, and post-

traumatic stress disorder ("PTSD"). [R. 12, 14–15, 90]. Her date last insured was December 31,

2007. [R. 99].

The Social Security Administration (the "SSA") denied Ms. Dias's applications for SSDI

benefits on July 16, 2008, and again upon reconsideration.[2] [R. 48–53]. Thereafter, Ms. Dias

requested an administrative hearing [R. 56–57], and a hearing took place before Administrative

Law Judge ("ALJ") James H. Packer on September 14, 2010. [R. 6]. Ms. Dias, who was

represented by counsel, appeared and testified at the hearing. [R. 6–32]. On October 1, 2010, the

ALJ issued a decision finding that Ms. Dias was not disabled. [R. 35–44]. The SSA Decision

Review Board declined to review Ms. Dias's claim within the prescribed timeframe, and the

ALJ's decision became final on January 24, 2011. [R. 45–47].

On June 6, 2011, Plaintiff filed a timely complaint with this Court[3] seeking review of the

Commissioner's decision pursuant to section 205(g) of the Act. See [R. 812]. The government

filed an assented-to motion to remand the case to the SSA on March 14, 2012, requesting further

development of the record, which the court granted on March 15, 2012. [R. 809–12]. On April 9,

2012, the SSA Appeals Council subsequently remanded the case to the ALJ for additional

---

[1] References to pages in the Administrative Record, which was filed in hard copy under seal pursuant to the Court's order [ECF Nos. 15–16], are cited as "[R. __ ]."
[2] The denial upon reconsideration is undated.
[3] The first complaint was filed under a different civil action number, 11–cv–11005–RGS, and was before Judge Stearns.

proceedings on the grounds that the original decision did not 1) contain an evaluation of the opinions submitted by Claimant's treating sources, 2) contain a detailed analysis of Claimant's credibility, or 3) contain an assessment of Claimant's ability to do work-related mental activities. [R. 813–17]. The ALJ held a second hearing on September 30, 2013 [R. 783–808] and subsequently issued a second decision on November 22, 2013 finding that Ms. Dias was not disabled as of her date last insured. [R. 761–74]. Ms. Dias's counsel filed timely written exceptions to the Appeals Council on November 25, 2013. [R. 755–60]. On May 20, 2015, the Appeals Council declined to assume jurisdiction and the ALJ's second decision became final. [R. 744–46]. On July 23, 2015, Ms. Dias filed a timely complaint with this Court, seeking review of the Commissioner's decision pursuant to section 205(g) of the Act. [ECF No. 1].

### C.     Factual Background

Ms. Dias was born May 2, 1968 [R. 201–04] in Portugal and lived there until the age of 18. [R. 9]. She described a traumatic upbringing and childhood due to her father's alcoholism. [R.15]. In 1986, Ms. Dias immigrated to the United States and graduated from Stoughton High School a year and a half later. [R. 10]. She is currently 49 years old.

From approximately 1989 to 2002, Ms. Dias worked as a customer service representative for an insurance agency. [R. 10–11]. She worked primarily face-to-face with customers at a service counter, and estimated that she spent about half the day seated behind a desk and half the day standing behind the counter. [R. 11]. She stopped working in 2002. [R. 10–11]. Additional facts are included below as applicable.

### D.     Medical Evidence

In 1994, Ms. Dias was involved in a car accident which resulted in, inter alia, a concussion and back pain. [R. 344–54]. She went to the emergency room in 1995 with post-

concussion syndrome and complaints of migraines due to the car accident. [R. 358–59]. Medical records indicate that her treating physicians believed that Ms. Dias was suffering from PTSD as a result of her difficult upbringing, which was exacerbated by the car accident. [R. 698, 700].

Ms. Dias was first diagnosed with fibromyalgia in January 2002. [R. 422]. In 2004, she visited Raphael Bueno, M.D. for extremity pain and weakness. [R. 276]. Dr. Bueno noted that although attempts at therapy resulted in limited improvement, MRIs and an EMG showed no abnormalities. Id. Dr. Bueno also wrote that during the physical exam Ms. Dias appeared "quite well." Id. In 2005, Ms. Dias suffered a post-partum hemorrhage following a Cesarean section during the birth of her twins and was transported via an emergency medical flight to Brigham and Women's Hospital, where she underwent a total hysterectomy. [R. 501–504]. After this, Ms. Dias began seeing doctors for complaints of headaches, blurred vision, depression, back pain, and fatigue. See, e.g., [R. 180–83, 204, 207, 209, 267, 269–71, 273–75, 493–94]. In 2005, Ms. Dias began seeing treating physician Lucia Dias-Hoff, M.D., M.S.[4] and treating rheumatologist Michael Hait, M.D. See, e.g., [R. 188–241, 264]. Both doctors reported fibromyalgia with varied pain, and some difficulty sleeping, but that she was tolerating medications well and was functional. See, e.g., [R. 264].

---

[4] Dr. Dias-Hoff completed a medical statement in July 2013 which states that she had been treating Ms. Dias since March 16, 2005. [R. 975]. However, on the same page she indicates she had been treating Ms. Dias for fibromyalgia since 2000 and PTSD since 2005. Id. Further, on the next page, a typed question on the form asks, "Have your patient's impairments lasted or can they be expected to last at least since your treatment began in 2008?" and Dr. Dias-Hoff checked, "Yes." [R. 976]. First, it is not challenged that Dr. Dias-Hoff's treatment of Ms. Dias began in 2005. The medical record supports this point. The fact that the form may have mistakenly suggested that Dr. Dias-Hoff began treating Claimant in 2008 does not affect the Court's analysis and is nothing more than harmless error, if it is error at all. Further, as discussed infra, the medical records indicate that Ms. Dias was first diagnosed with fibromyalgia in 2002.

In 2006, a chest X-ray came back normal and a CAT scan showed no abnormalities. [R. 234, 236]. In the same year, Ms. Dias had several pelvic exams in relation to her hysterectomy and other physical exams which revealed appendicitis. See, e.g., [R. 229–32]. In 2007, Ms. Dias went to Gregg Angell, M.D., complaining of abdominal pain, however, the physical exam showed appropriate appearance and orientation and a normal abdomen. [R. 571–98]. In 2008, Barbara Stelle, M.D., a consultative psychiatrist, examined Ms. Dias. [R. 333–34]. Dr. Stelle noted Ms. Dias's history of fibromyalgia, subjective complaints of depression and fatigue as well as subjective feelings of panic and anxiety related to traumatic events in her life. Id. Dr. Stelle also noted at the time Ms. Dias was well groomed, made good eye contact, had good rapport, and was cooperative although her affect showed depressed mood. Id.[5]

Also in 2008, Drs. Dias-Hoff and Hait examined Ms. Dias and reported her general appearance as active, alert, hydrated, and in no distress. See, e.g., [R. 180, 185, 292, 297, 305, 600]. Her abdomen was normal, and musculoskeletal exams showed full range of motion and strength in all joints and muscle groups. Id. At this time there were also no signs of inflammation or trigger points. Id. Physical exams remained unchanged throughout 2008. [R. 600–01]. Between 2008 and 2009, several state-agency medical consultants evaluated Ms. Dias. See, e.g., [R. 256–63, 284–91, 335–37]. These consultants determined that she retained the residual functional capacity ("RFC")[6] to perform light work in spite of her subjective complaints of pain. Id. One consultant concluded that she could lift and/or carry twenty pounds occasionally and ten

---

[5] It appears from the medical record that this was the first time she was formally diagnosed with depression. See [R. 334].
[6] The SSA defines "Residual Functional Capacity" as an individual's "impairment(s), and any related symptoms, such as pain, [which] may cause physical and mental limitations that affect what [he or she] can do in a work setting." 20 C.F.R. § 404.1545(a)(1). The SSA defines RFC to be "the most you can still do despite your limitations." Id.

pounds frequently, stand and/or walk with normal breaks for a total of six hours in an eight-hour workday, and sit with normal breaks for a total of six hours in an eight-hour workday. [R. 285]. This report also concluded there were no physical abnormalities, and no identified or counted trigger points, but noted that she had nonetheless been treated by a rheumatologist for fibromyalgia. Id.

Dr. Dias-Hoff examined Ms. Dias again in 2009 and referenced a surgery scheduled for abdominal pain. [R. 711–12]. Despite Ms. Dias's subjective complaints of pain, physical exams that day appeared normal. Id. Dr. Dias-Hoff recorded her impression of Ms. Dias's conditions as chronic pelvic pain, fibromyalgia, insomnia, and leg cramps, and she prescribed medication. Id.

Pearl Bacdayan, Ph.D, a licensed psychologist, began seeing Ms. Dias for psychotherapy on a weekly basis beginning in July 2009. [R. 694]. Dr. Bacdayan described Ms. Dias's struggles with the emotional effects of her PTSD and the physical effects of her fibromyalgia. Id. She described her as "emotionally volatile" but highly motivated to return to emotional and physical health. [R. 694–95]. In Dr. Bacdayan's 2010 medical source statement, she noted, inter alia, that Ms. Dias had mild limitations in understanding, remembering, and carrying out simple directions, and moderate limitations in understanding, remembering, and carrying out complex directions. [R. 695].

In 2013, for the first time in the medical record, Dr. Hait reported that Ms. Dias met the criteria for fibromyalgia based on multiple trigger points, non-restorative sleep, and chronic fatigue, and that, as a result of her impairment, she would miss about four days per month of work. [R. 956–59]. Dr. Hait opined that Ms. Dias could sit for only two hours and stand/walk for only two hours in an eight-hour day. [R. 958]. In this report, Dr. Hait listed Ms. Dias's prognosis as "good" and indicated that he thought she was capable of low stress jobs. Id. Similarly in 2013,

Dr. Dias-Hoff opined that Ms. Dias was unable to stand for more than thirty minutes at one time, unable to sit for more than fifteen minutes at one time, able to lift up to five pounds occasionally and unable to lift any weight on a frequent basis. [R. 975–76]. Dr. Dias-Hoff noted that Ms. Dias experienced moderate impairments in her ability to understand and remember instructions, maintain attention and concentration, and interact with others. Id. Also in 2013, Dr. Bacdayan submitted a psychiatrist report in which she agreed with the alleged onset date of January 2, 2004 for Ms. Dias's mental impairments and resulting limitations. [R. 911–14]. Specifically, Dr. Bacdayan noted that Ms. Dias's symptoms of anxiety, PTSD, and fibromyalgia began in 1994 with the car accident, became worse in 2002, and worsened again in 2004 with her pregnancy and surgery. [R. 914].

  **E.**  **Claimant's Hearing Testimony**

  Ms. Dias testified at both hearings before ALJ Packer—the first on September 14, 2010 [R. 8], and the second on September 30, 2013. [R. 783]. Her testimony was substantially consistent at both. She stated that as a teenager she was diagnosed with fibromyalgia after complaining of unexplained physical pain and fatigue.[7] [R. 17]. In 1994, Ms. Dias was involved in a serious car accident, in which she suffered a concussion and lower back injuries. [R. 15–16]. Ms. Dias indicated that her depression got worse after the car accident and that she has never been the same. [R. 15]. She further testified that treating physicians also believed that the car accident exacerbated her pre-existing fibromyalgia. [R. 17, 698, 700]. She testified about her headaches, fatigue, joint pain, bowel problems, stomach pains, and symptoms of depression. [R. 15–16].

---

[7] She previously stated she thought she was diagnosed with fibromyalgia in 2000, [R. 13] but the medical record first establishes a diagnosis of fibromyalgia in January 2002. [R. 422].

In 2005, Ms. Dias gave birth to twins following a Cesarean section which resulted in post-partum hemorrhage and a total hysterectomy. [R. 21]. According to Ms. Dias, she never truly recovered from this traumatic birth complication. [R. 21–22]. She asserted that she was unable to walk for a period of time, and continues to be physically and emotionally traumatized by the experience. [R. 21–22, 798]. She consistently takes pain medication, including Lyrica, from which she reports suffering debilitating side effects including loss of concentration, dizziness, nausea, and drowsiness. [R. 23, 795]. Due to her fibromyalgia and PTSD, she can no longer do many of the things she used to enjoy, including baking, sewing, and taking walks. [R. 25, 793]. She testified that she has to lie down, rest throughout the day, and take breaks between tasks. [R. 19–20]. She cannot drive for longer than 15 minutes without pain. [R. 25]. She suffers from short term memory loss, which prevents her from enjoying activities like reading and inhibits her ability to responsibly keep track of events like her children's doctor appointments. [R. 26–27]. Ms. Dias's mother and sister have had to assist her and her husband with housework and childcare as a result of Ms. Dias's conditions. [R. 30–31]. At the second hearing in 2013, the ALJ asked when her fibromyalgia worsened in order to better understand whether Ms. Dias was currently experiencing the described pain and limitations or whether she was describing what she experienced in the past. [R. 793]. Ms. Dias responded that she experienced pain and limitations prior to the birth of her children in 2005, her symptoms became worse after giving birth, and she was still suffering from the same pain and limitations in 2013. [R. 793–95].

## II.    THE ALJ'S DECISION

On November 22, 2013, the ALJ issued his second decision, which became the final decision, finding that Ms. Dias was not disabled under sections 216(i) and 223(d) of the Act. [R. 764–74]. At step one of the five-step analysis, the ALJ determined that Ms. Dias did not engage

in substantial gainful activity from her alleged onset date, January 2, 2004, through her date last insured, December 31, 2007. [R. 767]. At step two, the ALJ found that, through her date last insured, Ms. Dias's diffuse pain in combination with the complicated course of her pregnancy/delivery and appendectomy surgery combined to constitute a "severe" impairment because they significantly limited her ability to perform basic work activities. Id. The ALJ considered Ms. Dias's subjective complaints of pain all over her body, difficulty sleeping, and inability to lift more than 15 pounds. [R. 767]. Although she had a severe impairment under step two, the ALJ determined at step three that she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. §§ 404.1520(d), 404.1525 or 404.1526. [R. 771]. Here, the ALJ considered the medical evidence summarized above. Specifically, he noted that physical exams from 2007 and 2008 appeared normal, Ms. Dias retained full range of motion, and there were no signs of trigger points and inflammation to indicate fibromyalgia. [R. 767]. The ALJ determined that the record failed to establish fibromyalgia as a medically determinable impairment on or before December 31, 2007 because Ms. Dias failed to meet the fibromyalgia requirements under Social Security Ruling 12–2p.[8] [R. 768–69]. The ALJ next determined that Ms. Dias's medically determinable mental impairment of anxiety did not cause more than minimal limitation in her ability to perform basic mental work activities and was therefore non-severe during the relevant time period. [R. 769].

---

[8] Under this criterion, the medically determinable impairment of fibromyalgia is established when an individual has all three of the following: (1) a history of widespread pain that has persisted for at least three months; (2) at least 11 positive tender points found on particular areas of the body as specified by the ruling; and (3) evidence that other disorders that could cause the symptoms or signs must have been excluded. [R. 768–69].

At step four, the ALJ determined that through the date last insured, Claimant had the RFC to perform the full range of light work as defined in 20 C.F.R. 404.1567(b). Id. The ALJ considered all symptoms and the extent to which the symptoms were consistent with the objective medical evidence. Id. The ALJ also made a credibility determination at this step and concluded that, although he found the Claimant to be a sincere witness, "her testimony [was] not sufficient to establish a disabling level of limitations on or before December 31, 2007 given the objective medical evidence, the prescribed course of treatment and her own description of her daily activities." [R. 772].

The ALJ next determined that the Claimant's RFC did not preclude her from continuing past relevant work as an insurance clerk, a semi-skilled, sedentary job. [R. 771–73]. The ALJ also determined, alternatively, that there were additional jobs in the national economy other than her past relevant work that she could perform given her RFC, age and education. [R. 773–74]. He therefore concluded she was not disabled as defined by the Act during the relevant time period. [R. 774].

## III.   STANDARD OF REVIEW

This Court has jurisdiction pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the Commissioner of Social Security by instituting a civil action in federal district court. See 42 U.S.C. § 405(g). The district court may take a number of actions with respect to the Commissioner's decision. First, under sentence four of section 205(g), the court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. A court's decision under sentence four, however, can be based only on a review

of the administrative record of proceedings before the Commissioner. See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting 42 U.S.C. § 405(g)). If a claimant presents new evidence to the court that was not contained within the administrative record, the court may not consider it. "If additional evidence is to be considered, it must be by way of remand[]" pursuant to sentence six of Section 205(g). Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1503 (10th Cir. 1992). Sentence six permits the court to remand a case to the Commissioner for further proceedings and order the evidence to be added to the record for consideration. See 42 U.S.C. § 405(g) ("The court may . . . at any time order additional evidence to be taken before the Commissioner . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .").

Under section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). In conducting such review, the Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the court's review of the Commissioner's conclusions of law is de novo. Id. See also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."). Substantial evidence means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court "must affirm the [Commissioner's] resolution,

*even if the record arguably could justify a different conclusion*, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (emphasis added) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

## IV. DISCUSSION

Claimant advances a series of reasons why the ALJ's determination should be reversed. She argues the ALJ's decision is not supported by substantial evidence because (1) the ALJ failed to adequately weigh the opinions of her treating physicians, (2) the ALJ erred in failing to find that she met the requirements of fibromyalgia, (3) the ALJ erred in failing to find that she had a severe mental impairment, and (4) the ALJ erred in assessing her credibility. As explained below, the Court determines that these arguments are without merit, and therefore affirms the ALJ's decision.

### A. Weight of Opinions of Claimant's Treating Physicians

Claimant argues the ALJ failed to properly weigh the opinions of her treating physicians, Dr. Hait, Dr. Dias-Hoff, and Dr. Bacdayan, in accordance with Social Security regulations and rulings. The ALJ gave great weight to the state-agency medical consultants, and less weight to the opinions of Claimant's treating physicians.

A treating source's opinion should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with substantial evidence in the record." Taylor v. Astrue, 899 F. Supp. 2d 83, 87 (D. Mass. 2012); see 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in your case record, we will give it controlling weight."); Policy

Interpretation Ruling Titles II & XVI: Giving Controlling Weight to Treating Source Med.

Opinions, SSR 96–2p, at *1 (S.S.A. July 2, 1996)[9] (same). "[A]ny conflict between a treating

physician's opinion and other evidence in the record is to be resolved by the Commissioner."

Rodriguez v. Astrue, 694 F. Supp. 2d 36, 46 (D. Mass. 2010). "Regardless of whether or not the

administrative law judge decides to discount the treating physician's opinion, the decision 'must

contain specific reasons for the weight given to the treating source's medical opinion, supported

by the evidence in the case record.'" Rodriguez, 694 F. Supp. 2d at 42 (quoting SSR 96–2p, 1996

WL 374188, at *5).

The ALJ considers various factors in determining what weight to grant a treating

physician's opinion. Bourinot v. Colvin, 95 F. Supp. 3d 161, 175–76 (D. Mass 2015). Those

factors include, inter alia, "[the] [l]ength of the treatment and the frequency of examination . . .

[the] nature and extent of the relationship . . . the degree to which the opinion can be supported

by relevant evidence . . . the consistency of the opinion with the record as a whole . . . [whether

the treating physician is a specialist opining] about medical issues related to his or her area of

specialty . . . [and] any factors [brought to the court's attention] which tend to support or

contradict the medical opinion." 20 C.F.R. § 404.1527(c)(2)-(6). See also Bourinot, 95 F. Supp.

3d at 176. The regulations do not, however, require the ALJ to list these factors or to expressly

state how each factor was considered, as long as the ALJ provides "'good reasons' for the weight

---

[9] In March 2017, SSR 96-2p was rescinded for claims filed on or after March 27, 2017. See Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15,263 (Mar. 27, 2017). The Court may still consider SSR 96-2p here, however, because it was in effect when the claim was filed and when the ALJ issued his decision. Reyes v. Berryhill, No. CV 16-10466-DJC, 2017 WL 3186637, at *7 n.5 (D. Mass. July 26, 2017).

given to a treating source opinion." <u>Bourinot</u>, 95 F. Supp. 3d at 177 (quoting 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2)).

In assessing the Claimant's RFC, the ALJ placed great weight on the opinions of the state-agency medical consultants, rather than on the opinions of her treating source physicians, but he provided sufficient reasoning for his decision, namely, that there was a lack of objective evidence establishing that Claimant had a cognizable impairment prior to December 31, 2007. The ALJ noted that, although the opinions of her treating physicians indicated she could not do even sedentary work due to impairments that have "lasted or can . . . be expected to last at least since [] treatment began in 2008," those opinions, which were given in 2013, were "not given controlling weight because they [were] not supported by the physicians' own physical exam findings made during the period at issue. Statements made in 2013 that [were] not supported by the objective evidence cannot be used to establish limitations going back to 2007 and before." [R. 773, 956–59, 975–76].

Specifically, the ALJ rejected Dr. Hait's and Dr. Dias-Hoff's 2013 treating source statements regarding the Claimant's physical impairments dating back to 2007, her date last insured. Dr. Hait's 2013 opinion indicated the presence of multiple trigger points as well as exertional limitations on sitting, standing, and walking. [R. 772]. This contradicted Dr. Hait's physical exam findings in 2008 that showed full range of motion and strength in all joints and muscle groups, and no signs of inflammation or trigger points. Dr. Dias-Hoff's 2013 opinion indicated that Claimant was unable to perform even sedentary work on a regular and continuing basis during the relevant time period, however, this contradicted her own physical exam findings in 2008, which indicated no limitations on Claimant's ability to sit, stand, walk, or lift weights, as well as the state-agency consultants' opinions in 2008 that Claimant could perform the full

range of light work. [R. 772–73].

The ALJ also rejected Dr. Bacdayan's opinion in August 2013 regarding Claimant's mental impairments. He noted that her statement in 2013 that Claimant suffered a severe mental impairment on or before December 31, 2007 was not sufficient because it was not supported by objective evidence. [R. 770–71, 914]. Dr. Bacdayan's 2013 opinion contradicted several pieces of evidence from the relevant time period, including a psychiatric report in 2008 that indicated no more than mild limitations, Claimant's own function report in 2008 which detailed her daily activities as caring for her personal hygiene, taking care of her three year-old twins, performing household chores, preparing meals, and socializing, and physical exam findings from 2007 and 2008 which "failed to detail any overt symptoms consistent with depression, generalized anxiety disorder, panic attacks or PTSD." [R. 773]. Although Dr. Bacdayan agreed with the alleged onset date, she only did so in 2013 despite the fact that Dr. Bacdayan had been examining the Claimant in 2009. [R. 914]. The ALJ gave more weight to the state-agency psychological consultants who determined there was little way to infer the presence of a severe mental impairment prior to the date last insured given the lack of any finding of a severe mental impairment prior to that date. [R. 769]. The ALJ reasoned that the state-agency medical consultants' "opinions are supported by the objective medical record [that showed that Claimant did not have an impairment prior to the date last insured], including [treating physician] Dr. Hait's report from April 2008." [R. 772]. In sum, the treating sources' 2013 opinions were inconsistent with the findings of state-agency consultants, the objective evidence, and their own previous findings from 2008 and 2009.[10]

_____

[10] The Claimant cites <u>Lord v. Apfel</u> in support of her argument that the case should be remanded for the ALJ's failure to address the treating physician's opinion. In <u>Lord</u>, the question before the court was "specifically whether validity of the ALJ's decision is undermined by her failure to discuss explicitly the substantial body of evidence." <u>Lord v. Apfel</u>, 114 F. Supp. 2d 3, 12 (D.N.H. 2000). In that case, the ALJ failed to mention any of the post-hearing evidence

For these reasons, the ALJ did not improperly weigh competing medical opinions, but rather used the treating physicians' own medical records, a state-agency physician assessment, and objective evidence from the relevant time period to substantiate his determination of Claimant's level of disability prior to the date last insured. See Ferrazzano-Mazza v. Colvin, C.A. No. 14–239, 2015 WL 4879002, at *18–19 (D.R.I. Aug. 14, 2015) (holding that ALJ properly relied on well-supported state-agency psychologist opinions even when they conflicted with treating psychiatric nurse opinion, because nurse's opinion was inconsistent with the overall record and her own treating notes).

### B.    Fibromyalgia Determination

It appears that Claimant also takes issue with the ALJ's finding that Claimant's fibromyalgia was not a medically determinable impairment during the relevant time period, despite Claimant having been diagnosed with fibromyalgia during that time period. The ALJ determined that the medically determinable impairment of fibromyalgia was not established because Claimant failed to meet the criterion under Social Security Ruling 12–2p.[11]

A fibromyalgia diagnosis by a doctor, alone, does not satisfy a claimant's burden of proving fibromyalgia as a medically determinable impairment. Sinclair v. Berryhill, No. 16–10875, 2017 WL 3122563, at *6 (D. Mass. July 21, 2017) ("The simple impression or diagnosis of fibromyalgia, without more," was not enough to prove that the claimant's fibromyalgia was a

---

submitted by the claimant's treating physician. Id. at 14. The court reasoned that it was impossible to determine whether the ALJ properly weighed the evidence because there was no mention of relevant pieces of evidence from the treating physician. Id. "[W]hile the ALJ was entitled to find [the treating source's opinion] unworthy of credit, she was not entitled to find it unworthy of comment." Id. at 15–16. Here, the ALJ addressed the evidence from Claimant's treating physicians and explained that he discredited it because of inconsistent findings. For these reasons, the Court distinguishes Lord and rejects Claimant's argument.
[11] See supra n.8.

medically determinable impairment.). The court in <u>Sinclair</u> concluded that substantial evidence supported the ALJ's finding that the claimant's fibromyalgia was not a medically determinable impairment because, despite a diagnosis of fibromyalgia, there were inconsistencies between the claimant's reports to medical professionals and the medical evidence, there were no reports about how many tender points were positive, and there was no exclusion of other conditions that could be associated with claimant's symptoms. <u>Id.</u> <u>See also</u> <u>Huertas v. Astrue</u>, 844 F. Supp. 2d 197, 204–05 (D. Mass. 2012) (finding claimant did not meet burden of demonstrating further limitation from her fibromyalgia where there was little evidence in the record, beyond the fibromyalgia diagnosis, to indicate any specific limitations).

Here, although Claimant was diagnosed with fibromyalgia during the relevant time period, it was not until 2013 that Dr. Hait opined that Claimant met the criteria for fibromyalgia as a medically determinable impairment and indicated that she had multiple positive tender points. [R. 956–59].[12] As discussed above, the ALJ was warranted in not giving this opinion controlling weight because it was inconsistent with the objective medical evidence during the relevant time frame. Dr. Hait's report in 2008 showed 0/18 trigger points and no indication of widespread pain or tender points. [R. 769]. There is no evidence prior to December 31, 2007 that Claimant met the requirements to establish fibromyalgia as a medically determinable impairment given that she had no positive tender points, let alone at least 11; no indication, other than her own subjective statements, of widespread pain lasting more than three months; and no indication that her symptoms could not be associated with other conditions. Thus, the ALJ's determination

---

[12] Although Dr. Hait did not specify the number of positive tender points, he checked "yes" in response to the question "does your patient meet the criteria for fibromyalgia?," which requires at least 11 positive tender points.

that Claimant did not meet the requirements for fibromyalgia to qualify as a medically determinable impairment is supported by substantial evidence and affirmed.

## C.    Severe Mental Impairment During Relevant Time Period

Claimant argues that substantial evidence supports a finding that she had a severe mental impairment during the relevant time period. The ALJ found that Claimant's anxiety was a non-severe impairment because the evidence was insufficient to show that it imposed more than minimal effects on her ability to perform basic work-related tasks.[13]

"It is not enough for a plaintiff to be diagnosed with an impairment." Hurlburt v. Colvin, No. 3:15–cv–30173, 2017 WL 1206397, at *7 (D. Mass. Mar. 30, 2017) (explaining that although claimant was diagnosed with depression and anxiety, the court determined the ALJ did not err by finding depression and anxiety not severe) (citing Grady v. Astrue, 894 F. Supp. 2d 131, 141 (D. Mass. 2012)). "A mere diagnosis of a condition says nothing about the severity of the condition." White v. Astrue, No. 10–10021, 2011 WL 736805, at *6 (D. Mass. Feb. 23, 2011) (internal quotations omitted). To evaluate the severity of a mental impairment, an ALJ

---

[13] Claimant initially alleged disability due to fibromyalgia, depression, anxiety, and PTSD. It appears as though, through the course of the proceedings and in the medical record, the depression, anxiety, and PTSD are often discussed together. Although the ALJ found "the [C]laimant's medically determinable mental impairment of anxiety did not cause more than minimal limitation in [her] ability to perform basic mental work activities and was therefore non-severe on or before the date last insured," he used anxiety and depression interchangeably in the subsequent discussion. See, e.g., [R. 769] ("symptoms of depression anxiety" . . . "the medical record makes limited reference to depression and anxiety" . . . "claimant also related having fatigue and depression" . . . "Dr. Stelle diagnosed the claimant's condition as depression"). It is not wholly clear which mental impairment the ALJ is referencing, especially because, as discussed above, Dr. Stelle formally diagnosed Claimant with depression [R. 334], while Dr. Bacdayan referenced Claimant's "anxiety (post-traumatic stress)," rather than depression, in her report. [R. 911]. It is clear, however, that the ALJ did not find that Claimant had a severe medically determinable mental impairment, whether anxiety, depression, or PTSD. [R. 769]. Claimant also does not argue that the ALJ erred in his characterization of her mental impairment.

must evaluate whether it limits her physical or mental ability to perform basic work activities. See 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1520a.

The ALJ has to determine the degree of functional loss attributable to the mental impairment in four areas of activities: (1) daily living, (2) social functioning, (3) concentration, persistence or pace, and (4) deterioration or decompensation in work or work-like settings. See 20 C.F.R. § 416.920a(b)(3). The ALJ must rate the degree of a claimant's limitations in each of these areas and determine whether the degree of functional loss is so severe that it would prevent the claimant from performing that activity. Id. "[J]ust because [the claimant] suffers from depression and anxiety simply does not mean, a fortiori, that she has any impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities." Torres v. Barnhart, 249 F. Supp. 2d 83, 97 (D. Mass. 2003) (internal quotations omitted).

The ALJ found that Claimant had a medically determinable mental impairment of anxiety but that it did not cause more than minimal limitations in her ability to perform basic mental work activities and was therefore non-severe on or before the date last insured. [R. 41, 769]. The only formal psychological assessments regarding the relevant time period available to the ALJ were two reports compiled by state-agency psychologists and one self-assessment completed by Claimant, all from 2008. [R. 142–51, 242–55, 335]. The first agency psychologist's report concluded that there was insufficient evidence regarding the relevant time period to determine whether Ms. Dias had any mental impairment prior to her date last insured. [R. 242–55]. The second agency psychologist's report stated that, upon reconsideration, an additional assessment did not permit an inference of severity prior to Claimant's date last insured. [R. 335]. Only in 2010 did Claimant's treating psychologist, Dr. Bacdayan, opine that Claimant had a severe

mental impairment affecting her employability, and that assessment makes no mention of this impairment existing prior to the date last insured.[14] [R. 694–95].

Based on these reports and on Claimant's self-assessment, the ALJ determined that prior to December 31, 2007, Ms. Dias: (1) had no limitations in her activities of daily living, which included doing household chores, caring for her three-year-old twins, shopping, and going to doctor's visits; (2) had no limitation in social functioning, which included visits and phone calls with friends and an ability to travel independently within the community; (3) had a mild limitation which would limit her ability to understand, remember, and carry out detailed or complex instructions, but would not limit her in carrying out simple or familiar instructions; and (4) had no episodes of formal psychiatric treatment or psychiatric hospitalization showing an episode of decompensation. [R. 769–71]. The ALJ explicitly discussed Claimant's limitations in each of the functional categories in determining that her degree of functional loss was not so severe that it would prevent her from performing basic activities. [R. 770–71]. As such, substantial evidence supports the ALJ's conclusion that Claimant did not have a severe mental impairment prior to her date last insured. See Torres v. Barnhart, 249 F. Supp. 2d 83, 97 (D. Mass. 2003) (finding substantial evidence supported ALJ decision of no severe mental

---

[14] Claimant urges that this Court follow decisions from the Second, Seventh, and Eleventh Circuits, which have held that retrospective diagnoses are to be given "significant weight" even if the physician did not treat the claimant until after the disability period. [ECF No. 25-1 at 22] (citing Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981); Stark v. Weinberger, 497 F.2d 1092, 1097 (7th Cir. 1974); Boyd v. Heckler, 704 F.2d 1207, 1211 (11th Cir. 1983)). Those cases are inapposite, however, because in each of those cases, the treating physicians specifically opined that the claimant's disability was severe *during the relevant time period*, which Dr. Bacdayan did not do here. Although Dr. Bacdayan concluded in 2013 that Claimant's anxiety and PTSD began in 1994 and agreed with the alleged onset date of January 2, 2004 [R. 914], she did not specifically opine that Claimant's disability was severe during the relevant time period. Further, the ALJ appropriately discredited the 2013 finding from Dr. Bacdayan. See supra section IV.A.

impairment under the Act, even where plaintiff suffered from depression and anxiety).

### D. ALJ's Adverse Credibility Determination

Claimant argues the ALJ erred in assessing her credibility because he failed to appropriately evaluate her complaints within the proper context. Claimant argues that her activities of daily living were not comprehensively considered in the ALJ's decision and thus the credibility determination was fatally flawed. As discussed above, the ALJ fully evaluated Claimant's functional abilities and activities of daily living, so the only remaining issue is the credibility determination.

The reason for a credibility finding must be grounded in the evidence and articulated in the ALJ's decision. See 20 C.F.R. § 404.1529(c)(3); SSR 96–7p.[15] In general, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987). The ALJ's determination must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific and clear to any subsequent reviewer. See 20 C.F.R. § 404.1529(c)(3). See also Wells v. Barnhart, 267 F. Supp. 2d 138, 145 (D. Mass. 2003) (quoting Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) ("A finding that a claimant is not credible 'must be supported by substantial evidence and the [ALJ] must make specific findings as to the relevant evidence he considered in determining to disbelieve the claimant.'"). When "subjective complaints concerning [a claimant's] condition on or before [the date last insured] are not consistent with

---

[15] Social Security Ruling 96–7p was rescinded and replaced by Social Security Ruling 16–3P in March 2016. Gottier v. Colvin, No. 15-CV-355-SM, 2016 WL 4734402, at *3 n.1 (D.N.H. Sept. 12, 2016). At the time of the ALJ's decision, however, SSR 96–7p was applicable. Id.

the objective medical findings of record," an ALJ is entitled to base his determination on other evidence in the record. Evangelista v. Sec'y of Health and Hum. Servs., 826 F.2d 136, 141 (1st Cir. 1987). See also Makuch v. Halter, 170 F. Supp. 2d 117, 126 (D. Mass. 2001) ("The ALJ, in resolving conflicts of evidence, may determine that the claimant's subjective complaints concerning his [or her] condition 'are not consistent with objective medical findings of record,' if the ALJ's determination is supported by evidence in the record.").

As discussed above, the ALJ found that Claimant's testimony regarding the severity of her pain and limitations "[was] not sufficient to establish a disabling level or limitations during [the relevant time period] given the objective medical evidence, the prescribed course of treatment and her own description of her daily activities." [R. 772]. The ALJ explicitly outlined his reasoning for the credibility determination, including his reliance on physical exam findings, physician reports, lack of referrals to physical therapy, and Claimant's own function report and testimony. Id. The ALJ made his adverse credibility finding after considering all of the evidence in the record, including the inconsistencies between the subjective evidence and the objective medical evidence during the relevant time period. Because the ALJ found that Claimant's testimony was inconsistent with the objective medical evidence, he was warranted in finding her not credible. Id. Accordingly, the ALJ's adverse credibility determination is based on substantial evidence and is affirmed.

## V.     CONCLUSION

For the reasons stated herein, the ALJ's decision that Ms. Dias was not disabled prior to her date last insured was supported by substantial evidence, and therefore Claimant's motion to reverse and remand [ECF No. 25] is DENIED and the Commissioner's cross-motion to affirm [ECF No. 32] is GRANTED.

**SO ORDERED.**

February 20, 2018                                            /s/ Allison D. Burroughs
                                                             ALLISON D. BURROUGHS
                                                             U.S. DISTRICT JUDGE